UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

BOSSARD IIP, INC.,
ZURICH-VERSICHERUNGSGESELLSCHAFT,

        Plaintiffs,

       v.                                   Case No. 03-C-1434

SPECIAL FASTENERS ENGINEERING
COMPANY, LTD,

        Defendants.

MEMORANDUM DECISION RESPECTING ORDER OF MARCH 31, 2008

      This case involves failed fasteners installed in John Deere tractors. Bossard IIP, Inc., who distributed the fasteners, asserts that only the fasteners manufactured by defendant Special Fasteners Engineering Company, Ltd., (SFE) failed from hydrogen embrittlement. Yet two other manufacturers (Rockford and AFI) made fasteners installed in John Deere tractors during the same period.

      Only a small percentage of the fasteners remain. One month after litigation commenced, John Deere, a third party, discarded the fasteners removed as part of rework. Of the 1.6 million fasteners that defendant provided to Bossard, the following have been provided to defendant in discovery: 14 heads of defendant's fasteners, 98 shanks of fasteners not identifiable by manufacturer, 175 intact defendant fasteners, and 9 intact fasteners made by another manufacturer. Faced with this and other evidentiary concerns, defendant has asked this court to sanction the plaintiffs, Bossard and its insurer, and to dismiss the complaint.

Having reviewed the eight pending motions and voluminous supporting documents, the following is clear. Evidence important to the defense no longer exists. Regardless of who had possession or control of the fasteners, files and logs, it is disingenuous for plaintiffs to now maintain that "defendant has not presented a single witness who observed a non-SFE fastener fracture" and that "defendant has not even presented an expert witness who is able to offer an opinion with a reasonable degree of certainty as to an alternative cause of the fractures." (Doc. # 195, p. 3) Further, plaintiffs' failure to authenticate its exhibits properly and to otherwise file admissible evidence in support of its summary judgment has made briefing lengthy and cumbersome. Because there is enough evidence to create genuine issues of material fact, this case will proceed to trial on all but one issue. However, sanctions are warranted.

PLAINTIFFS' MOTION TO STRIKE DEFENDANT'S REPLY TO PLAINTIFFS'
SUPPLEMENTAL BRIEF TO PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
FOR SANCTIONS, OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO FILE
INSTANTER, PLAINTIFFS' RESPONSE TO DEFENDANT'S SUPPLEMENTAL BRIEF IN
SUPPORT OF ITS MOTION FOR SANCTIONS  (DOC. # 210)

Plaintiffs have moved to strike defendant's reply to its supplemental brief responding to defendant's motion for sanctions, or in the alternative, for leave to file instanter, plaintiffs' response to defendant's supplemental brief supporting its motion for sanctions. At a hearing on February 23, 2007, the court permitted supplemental briefing on the issue of sanctions. In a letter filed in reply to the plaintiffs' supplemental brief, defendant acknowledged that the court had not invited its submissions, but asked that it be considered nonetheless. Plaintiffs moved to strike the letter brief fearing that defendant would gain an "unfair advantage" on the issue of sanctions, or, alternatively, allow the plaintiffs to file a response. Because further briefing was not contemplated and is unnecessary, the court will

2

grant plaintiffs' motion to strike defendant's supplemental brief and deny plaintiffs' motion for leave to file instanter a response to defendant's supplemental brief.

## DEFENDANT'S MOTION FOR SANCTIONS (DOC. # 161)

Ultimately, defendant seeks a drastic sanction - dismissal - based on plaintiffs' failure to: (1) timely produce relevant evidence (consisting of metallurgy lab reports from MET regarding Rockford fastener failures) in direct contradiction to the court's order; (2) retain key evidence, *i.e.,* removed fasteners; (3) retain the foundational documents for Alan McGee's failure rate analysis, which formed the bases of plaintiffs' expert witness' opinion; and (4) retain certain documents collected by QMS relating to the QMS portion of the rework. Alternatively, defendant asks that discovery be reopened so that it may conduct a probe of the recently produced test reports and that plaintiffs be directed to pay all reasonable expenses related to this discovery, including but not limited to, deposition costs and attorneys' fees.

To place the dispute in perspective, it is important to look at a time line of the events beginning with plaintiffs' notice to defendant of its claim.[1]  On January 30, 2003, John Deere employees discovered that fasteners were "popping off" tractors stored inside and outside of a warehouse in Tennessee.  Bossard was notified, and, on February 12, 2003, Jean-Louis Jerome, Bossard's VP of Engineering, flew to Taiwan and met with defendant's President, Leaon Huang, to discuss the scope of the fastener problem.  (Doc. # 202, Dep. Jerome, Ex. A, p. 155)  A few days later, Jerome sent his audit report to Huang, setting forth the alleged cause of the fastener fractures and provided for corrective action.  (*Id.*, Exs. B, C)

---

[1]The following facts were submitted by the parties for purposes of resolving the motion for sanctions, but not are necessarily admissible for purposes of summary judgment.

On February 18, 2003, Bossard advised defendant that the problem was more severe and a large number of tractors were recalled. (*Id.*, Ex. D) Bossard provided defendant with a report from its independent metallurgical lab, and a report from John Deere's lab. (*Id.*, Ex. E)

On April 4, 2003, Bossard responded to a letter from defendant with questions about the occurrence. (*Id.*) Stephen Tan, a member of defendant's Board and parent company, Trifast, indicated that defendant would like to ascertain the cause through its own failure analysis. (*Id.*, Ex. G) At that time, Tan asked for ten samples of screws for independent testing, as well as copies of independent test reports. (*Id.*) Bossard provided the samples, and notified defendant of its liability and damages claim on April 15, 2003. (*Id.*, Ex. H)

On May 7, 2003, Bossard sent a second notice letter of its claim against defendant. (*Id.*, Ex. I) Bossard advised that once John Deere made a claim, it would forward the claim to defendant along with the complete claim for the defective parts. (*Id.*) On May 13, 2003, defendant indicated that it was seeking legal counsel with whom it would consult regarding the handling of plaintiffs' claim. (*Id.*, Ex. F) Defendant made no further requests for fasteners for another two years. A complaint was filed on December 11, 2003, and John Deere discarded the fasteners in January of 2004.

Defendant served plaintiffs with a first set of discovery requests on May 10, 2005. Interrogatory No. 6 directed plaintiffs to identify the names of other manufacturers who provided fasteners to Bossard with the same specifications as the defendant fasteners, including the quantity ordered, received and date of shipment, applications for which the fasteners were used, whether any testing has ever been done by the plaintiffs or any third party of any of the fasteners and the specifications and part number for each fastener. (Aff.

4

Remington, ¶ 2, Ex. A)  Defendant's Request for Production No. 47 directed plaintiffs to produce "[a]ll documents that were relied upon, support, or reference the plaintiffs' responses to SFE's First Set of Interrogatories."  (Aff. Remington, ¶ 3, Ex. B)  Hearing no response from the plaintiffs, defendant filed a motion to compel.  Thereafter, this court ordered plaintiffs to respond to all outstanding interrogatories no later than July 15, 2005, directed plaintiffs to provide all documents not later than July 25, 2005, and sanctioned the plaintiffs $500.

On July 14, 2005, plaintiffs indicated in its responses to interrogatories that there was "some further testing on Rockford parts from June '04 (few pieces broke during assembly)."  (*Id.*, Ex. M)  Plaintiffs provided a report drafted by Atrona Material Testing Laboratories.  Additional documents were produced at the deposition of plaintiffs' 30(b)(6) witness, Eric Nimmer, on July 21, 2005.  It was at that time that defendant first inquired into the existence of the fasteners and was informed "that the vast majority of those would have been thrown away as scrap during the repair process at John Deere."  (Doc. # 202, Ex. J, p. 99)

On September 19, 2005, defendant mailed a subpoena to John Deere requesting various materials, including all documents relating to the "alleged damages suffered by plaintiffs or John Deere and the resulting corrective measures" and "any incident of failures of fasteners where hydrogen embrittlement was suspected of, or determined to be the case of failure, in any application.  (Aff. Remington, ¶ 6, Ex. E, ¶¶ 16, 26)  Five months later, John Deere employee Al McGee, who drafted the failure rate analysis, discarded his file containing foundational documents for the report.  Eight months later, John Deere produced the remaining responsive documents. Previously, John Deere conducted a failure rate analysis to demonstrate how fasteners were failing in the tractors, and it was this analysis

5

which was relied upon by Dr. Thomas Eager, plaintiffs' expert, in his report. Notably, McGee discarded the foundational documents for the failure rate analysis five months after Dr. Eager issued his report.

Defendant deposed Eric Nimmer a second time on October 13, 2005. Nimmer testified regarding occurrence with the Rockford GX20234 fasteners in 2004, (Aff. Remington, ¶ 9, Ex. H), identified Atrona, and referenced a lab in Oak Ridge. (Doc. # 177, Ex. E, pp. 1601-161)

On December 14, 2005, defendant sent to the plaintiffs a Third Request for Production of Documents. Request Nos. 6 and 7 sought all documents concerning any other fastener failures in the last ten years due to hydrogen embrittlement, and any other failures for parts Bossard sold to John Deere within the last ten years. (Aff. Remington, ¶ 13, Ex. L) Again, on June 27, 2006, defendant requested documents relating to problems with hydrogen embrittlement encountered by John Deere and/or Bossard other than the alleged issue with the defendant fasteners. (Aff. Remington, ¶ 20, Ex. S)

On June 2, 2006, Wayne Southall, a John Deere employee, produced documents at his deposition regarding the tractor rework. At that time, he testified that he sent the shanks or bolt heads to a lab, MET, in Oakridge, Tennessee. (Doc. # 177, Ex. H, pp. 61-62) In his second deposition, Southall again discussed the actions he undertook to investigate the fastener failure, including use of the MET lab to analyze some of the alleged defendant fasteners. (Aff. Remington, ¶ 12, Ex. K)

Defendant requested a copy of the MET report. In turn, plaintiffs asked Nimmer whether he had documents and Nimmer agreed to search the Bossard e-mail system. (Doc. # 177, Ex. G) Nimmer avers that he checked the body of hundreds of e-mails looking for the

6

report, and would need to know that he was searching for the 2004 MET report to find it in an e-mail. It was not a report that Bossard generated or asked to be generated as it was ordered by a third party (John Deere) from an outsourced lab. (*Id.*) Notably, Bossard never consulted with or retained MET. Moreover, defendant has learned that since July of 2004, plaintiffs had been in possession of nine additional MET reports that had not been produced. (Aff. Remington, ¶ 14, Ex. M)

Plaintiffs agreed to submit Southall for a third deposition about the 2003 and 2004 MET reports. At his third deposition, Southall clarified that his former testimony was erroneous and acknowledged that 2004 MET reports related to Rockford fasteners, not defendant's fasteners. Also, plaintiffs point out that the 2003 MET report concluded that defendant's fasteners failed due to hydrogen embrittlement.

Rule 37(b)(2), Federal Rules of Civil Procedure, authorizes a court to impose a variety of sanctions, including dismissal where a party "fails to obey an order to provide or permit discovery." But, dismissal is a harsh sanction to be used in limited circumstances. *Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997). Because the punishment should fit the crime, fees and fines are often the best sanctions as they can be scaled appropriately. *Wade v. Soo Line R.R. Corp.,* 500 F.3d 559, 564 (7th Cir. 2007), (citing *Maynard v. Nygren*, 332 F.3d 462 (7th Cir. 2003)).

In *Maynard*, the Seventh Circuit Court of Appeals held that dismissal is an appropriate sanction for a violation of Rule 37 when there is "clear and convincing evidence of willfulness, bad faith or fault," 332 F.3d at 468. Recently, the Seventh Circuit expressed doubt as to whether "clear and convincing" evidence is required noting that *Maynard* failed to address *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed.2d 755 (1991) and

7

*Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 (1983).

 *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Financial Services,* --- F.3d ----, 2008 WL 441758 (7th Cir. 2008)*; Wade*, 500 F.3d at 564.   In *Grogan* the United States Supreme Court held that heightened burdens of proof do not apply in civil cases unless a statute says so or the Constitution requires an elevated burden.   *Wade*, 500 F.3d at 564.

While sanctions are appropriate respecting plaintiffs' failure to produce the 2004 MET reports, the extreme penalty of dismissal is not warranted.  Willfulness and bad faith are not evident  with respect to plaintiffs' failure to produce the  2004 MET reports even under a preponderance standard.

Defendant asserts that plaintiffs' conduct violates the July 15, 2005, court order granting defendant's motion to compel.  The order required the plaintiffs to tender their interrogatory responses and complete responses to defendant's document requests, immediately.  As discussed above, defendant served  plaintiffs with interrogatories on May 10, 2005.  Interrogatory No. 6 directed plaintiffs to identify other manufacturers who provided fasteners to Bossard,  and to indicate whether they or third parties had done testing on any of the fasteners.

Plaintiffs objected to Interrogatory No. 6 as "vague, overbroad and irrelevant," but then answered as follows:  "Typical receiving inspections were performed on each lot received.  Also some further testing on Rockford parts from June 04 (few pieces broke during assembly)." (Doc. 117, Ex. N, p. 5)  Hence, the interrogatory response identified the Rockford '04 occurrence, and the plaintiffs produced their file regarding the 2004 Rockford occurrence on July 13, 2005 (Ex. L)

8

In addition, on October 13, 2005, Eric Nimmer testified in his deposition regarding an incident with John Deere in 2004 in which a part of No. GX20234 tested positive for hydrogen embrittlement. (Doc. 177, Ex. E, pp. 160-161) That deposition testimony reads as follows:

A:  First of all, I disagree with the statement that's written there. What happened in this instance was that John Deere found over the course of, oh boy. Probably five months from start to finish approximately ten pieces that while installing the fasteners, they broke during installation. This was typical of what they saw during that time. And - -

Q:  Typical of what they saw during that time. What does that mean?

A:  What you see here is typical of the pieces that they found that broke during that time.

Q:  The pictures that are attached to the Atrona report.

A:   Yes.

Q:  Okay.

A:  Initially, John Deere sent some pieces or a piece, I don't know what it says, to some lab in Oakridge, who came back with this statement.

Q:  That they had occurred as a result of hydrogen embrittlement?

A:  That was their statement. Which didn't make any sense because the part broke during installation. When all of this was re-evaluated, what was found is that the broken pieces had very unusual heat treatment, evidence of very unusual heat treatment cycles. And the bottom line conclusion of all of these discussions, this, the Atrona report, what was concluded is that a few pieces from this production were stuck in a rotary furnace. They were manufactured by Rockford Fasteners. Rockford Fasteners was using a heat treater that had rotary furnaces for the heat treatment and this type of furnace can have pieces get stuck.

(Ex. E, pp. 159-161)

In August of 2006, John Deere sent a 2003 MET report to the plaintiffs and defendant. The report prompted a search by plaintiffs, which uncovered nine Rockford MET

9

reports that had been in the possession of Eric Nimmer since July of 2004. Nimmer stated that he searched his electronic file folder labeled GX20234 June '04 in response to document requests and interrogatories relative to the 2004 Rockford occurrence. He added that "[g]iven the findings in the Atrona report and the final resolution of the Rockford fastener occurrence (i.e., it did not involve hydrogen embrittlement), the existence of a 2004 MET report never entered into [his] mind until [he] found it in August of 2006 pursuant to defendant's request to find it." (*Id.*)

On this record, it appears that plaintiffs neither generated the 2004 MET reports nor held them in the ordinary course of business. (Doc. # 177, Ex. G) John Deere ordered the report from the outsourced lab, and plaintiffs never consulted with or otherwise retained the lab. (*Id.*)

Because the 2004 MET reports state that the "intergranular nature of the failure indicates that your parts failed as a result of hydrogen embrittlement," one could infer that problems with the 2004 Rockford fasteners may have occurred in 2003. (Doc. 163, Ex. P, P6734) Moreover, it is known that John Deere used all of the Rockford fasteners from those same lots and that defendant has known about the '04 occurrence since 2005.

This case has not been set for trial. On February 23, 2007, this court indicated that defendant was entitled to additional discovery relating to the 2004 MET reports. The defendant argues that it needs to retake the depositions of approximately five witnesses (Eric Nimmer, Jean-Louis Jerome, Al McGee, Dr. Thomas Eager and Wayne Southall), and proceed with the 30(b)(6) witness from Rockford and the lab technician at MET. As a result, the court concludes that plaintiffs will be responsible for reasonable costs and fees associated with the additional discovery relating to the 2004 MET reports disclosed in August 2006.

Defendant has accused plaintiffs of spoliation and raised the same issue with respect to summary judgment. Spoliation occurs when a party breaches its duty to preserve evidence within its control which is essential to a claim or defense in litigation. *Sentry Ins. v. Royal Ins. Co. of America*, 196 Wis.2d 907, 918, 539 N.W.2d 911 (Ct. App. 1995). In such instances, the court may dismiss or issue a sanction that is "tantamount to dismissal." *Id.* (*citing Milwaukee Constructors II v. Milwaukee Metropolitan Sewerage District*, 177 Wis.2d 523, 502 N.W.2d 881 (Ct. App.1993)). Dismissal based on spoliation of evidence requires a finding of egregious conduct, which is defined as "a conscious attempt to affect the outcome of litigation or a flagrant knowing disregard of the judicial process." *Garfoot v. Fireman's Fund Ins. Co.*, 228 Wis.2d 707, 717, 599 N.W.2d 411 (Ct. App. 1999).

In *Sentry Ins. v. Royal Ins. Co. of America*, a refrigerator was alleged to have caused a house fire. *Id.*, 196 Wis. 2d at 911. The homeowner's insurer hired an expert to test the suspect refrigerator. *Id.* The testing, which was conducted before litigation commenced, included the removal of various parts. Id. Eventually, the refrigerator was discarded by the owner of the warehouse where the refrigerator was stored. *Id.* The warehouse owner contended that Sentry authorized disposal of the refrigerator, whereas Sentry claimed that the disposal was without authorization and contrary to its instructions. *Id.* This occurred before the defendant had an opportunity to inspect the refrigerator. *Id.* The trial court dismissed the case and the Court of Appeals upheld, giving deference to the trial court's factual determination that the "removal of the component parts was an intentional act that deprived the [refrigerator manufacturer's insurer] of the opportunity to conduct tests essential to its adequate defense of the claim made against it." *Id.* at 916.

Plaintiffs filed this case on December 11, 2003.  One month later, John Deere discarded all of the fasteners it had collected as part of a rework.  Hence, defendant has been forced to defend this case with a small sampling of the original 1.6 million fasteners provided to the plaintiffs.  Defendant has received just 14 of its fastener heads, 98 fastener shanks that are not identifiable, 175 intact SFE fasteners that were removed from John Deere tractors, and nine intact AFI fasteners.  This sampling provides the basis for plaintiffs' $3,298,450.95 claim.

Had plaintiffs been affiliated or otherwise controlled John Deere, dismissal would be appropriate.  Unlike the insurer in *Sentry,* plaintiffs did not engage in destructive testing and did not order John Deere to discard the fasteners.  Nothing in this record suggests that plaintiffs made a conscious or knowing attempt to affect the outcome of this litigation.  They do not share a common database with John Deere, have no authority over the actions of John Deere employees, and have worked with John Deere at arms length throughout this litigation.  (Doc. # 177, Ex. G)

Plaintiffs, in part, are proceeding on a contract theory that defendant agreed to manufacture all fasteners free of hydrogen embrittlement.  Hence, the sampling of fasteners provided to defendant is relevant to the plaintiffs' liability claim.  Indeed, plaintiffs have produced logs, reports, and witnesses on the issue of liability.  However, the destruction of the fasteners, some of the logs and the foundational documents for McGee's analysis place the plaintiffs in a precarious position with respect to damages.  The issue of who manufactured the fasteners which failed and the number of fasteners that failed will need to be resolved at trial.

Similarly, the foundational documents for the McGee report and the other half of the QMS logs were never in the plaintiffs' possession or control. It does not appear that plaintiffs had prior notice of or involvement in the destruction of this particular evidence. On the other hand, defendant has been on notice of this litigation from the time of the occurrence. In 2003, plaintiffs immediately placed defendant on notice of the problem with the fasteners, traveled to Taiwan to meet with defendant, provided defendant with a copy of the audit, advised defendant of the rework, and provided defendant with a metallurgical report. Plaintiffs answered the questions posed by defendant, provided the ten samples of fasteners that defendant requested for its independent failure analysis, and served defendant with notice of its claims. Indeed, it was two years after plaintiffs provided the ten samples that defendant inquired about the remaining samples. Therefore, to the extent that the defendant is asking for dismissal based on spoliation, that request will be denied.

DEFENDANT'S MOTION TO STRIKE (DOC. # 183) AND PLAINTIFFS' MOTION FOR LEAVE TO FILE AND/OR TO ATTACH AFFIDAVITS OF DAVID M. ROACH TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S RESPONSE (DOC. # 198)

Before turning to the pending dispositive motions, the court must address defendant's motion to strike affidavits and exhibits submitted in support of plaintiffs' motion for summary judgment for failure to comply with the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Defendant maintains that seven of plaintiffs' affidavits contain "hearsay, speculation, assumptions of facts not in evidence, assertions of fact without foundation, and expert testimony disguised as lay testimony." (Doc. # 184) Regardless, three laboratory reports must be stricken because none of the authors has been named as experts, the reports do not identify the manufacturer of the fasteners reviewed, they contain

13

inadmissible hearsay, lack foundation, and proffer expert testimony in violation of Rules 26 and 56. Finally, none of the exhibits is properly authenticated.

With respect to the plaintiffs' failure to authenticate the documents pursuant to Rule 901, defendant asks the court to strike all exhibits supporting plaintiffs' motion for summary judgment, exhibits A-I, L-Q, W-FF and II, submitted in opposition to defendant's motion for summary judgment, including exhibit A to Drinnon's affidavit and exhibits A, C, D and E submitted with plaintiffs' reply in support of their summary judgment motion. Plaintiffs do not contend that the exhibits are self-authenticating or otherwise admissible. Instead, plaintiffs filed a motion for leave to attach the affidavits of David M. Roach to their motion for summary judgment and reply to defendant's response to plaintiffs' motion for summary judgment.

While a party may challenge documentary evidence submitted in support of a summary judgment motion on the ground that it is unauthenticated or inadmissible, see *Moore et al., Moore's Federal Practice* ¶ 56.14[4] [a] (3d ed. 2007), it is also true that "[t]he court may permit affidvits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed. R. Civ. P. 56(c) (emphasis added). Plaintiffs offer no explanation for their delay in rectifying their evidentiary shortcomings. Nonetheless, dismissal of the plaintiffs' entire summary judgment motion is not appropriate. Such a consequence is disproportionate. Alternatively, the court will grant plaintiffs' request for leave to file the affidavit of David Roach which seeks to authenticate the exhibits.

Regardless, there are problems with plaintiffs' affidavits and exhibits which transcend authentication. Four of the affidavits purport to be based on the "common knowledge that SFE manufactured all of the fractured fasteners." The affidavits of John

14

Deere employees, Michael McClain, Donald Casper, Wayne Southall, and Donald Casper, contain this identical statement:

> By the time the rework of the tractors was underway, it was common knowledge among everyone involved in every aspect of this quality issue, including the investigation of the cause of the failure, the development of the rework process and the implementation of the same, that all of the fractured fasteners were of one manufacturer, which I knew to be SFE.

(Plaintiffs' Ex. R, Aff. McClain, ¶ 5; Aff. Ex. S, Aff. Casper, ¶ 7; Aff. Southall, Ex. T, ¶ 9; Ex. U, Aff. McGee, ¶ 5)

Each of these affidavits states that it is based on personal knowledge and that the fasteners examined were manufactured by the defendant. However, to the extent that they purport to speak on behalf of everyone involved in the rework process, they are inadmissible hearsay or otherwise lack the proper foundation. The paragraphs cited above will be stricken from the Affidavits of McClain, Casper, Southall and McGee. Similar paragraphs will be stricken from the affidavits of Jean Louis Jerome, Eric Nimmer, and David Drinnon, the owner of QMS. (Plaintiffs' Ex. K, Aff. Jerome, ¶ 14; Ex. V, Aff. Nimmer, ¶ 13; Ex. GG, Aff. Drinnon, ¶ 3) Notably, plaintiffs concede, for purposes of the motion, that these paragraphs may be stricken.

Next, defendant asks the court to strike the affidavits of Eric Nimmer and Jean Louise Jerome. These affidavits contain conclusory statements, statements lacking foundation, and statements rooted in speculation. The court agrees that certain statements in these affidavits appear to lack foundation and, at best, are conclusory or speculative. For example, Jerome "concluded that the hydrogen embrittlement found in SFE's fasteners resulted from the use of TYC's large tubs and large oven." (Plaintiffs' Ex. K) Similarly,

paragraphs 8, 9, 11, 13, and 15 - 19 lack foundation and fail to offer any explanation as to how he obtained personal knowledge.

Likewise, Nimmer reaches conclusions and makes assertions for which he may or may not have personal knowledge. For example, he claims to know that the number of fasteners provided to SFE exceeded the number of fasteners John Deere and Bossard needed to determine that the damage to the fasteners was caused by hydrogen embrittlement, that the number of fasteners SFE has had at its disposal is sufficient to extrapolate that all of the fractured fasteners were damaged by hydrogen embrittlement, and that having identified SFE as the source of fractured fasteners, along with the cause and indicators of the failures, it was a logical and reasonable step to conclude that every fastener fractured in delayed fashion on John Deere L100 series tractors was an SFE fastener. Paragraphs 14, 20, 21, 27, and 38-40 are flawed in this respect.

In addition, the Jerome and Nimmer affidavits oscillate between lay and expert testimony, and are otherwise unsubstantiated by expert reports. Plaintiffs never disclosed Jerome as an expert and failed to provide a report of his opinions. Nimmer, who was initially disclosed as an expert, never tendered an expert report.

According to Federal Rule of Evidence 701, lay witness testimony in the form of opinions or inferences "is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. The 2000 amendments to Rule 701 added (c) to prevent evasion of the reliability requirements of Rule 702 and the disclosure requirements of Rule 26 by "the simple

16

expedient of proffering an expert in lay witness clothing." Advisory Committee Notes, 2000 Amendments to Rule 701. Essentially, the test is whether the witness has "specialized knowledge that the lay person cannot be expected to possess" and reasonably applies that knowledge to the relevant facts. *United States v. Conn*, 297 F.3d 548, 554-55 (7th Cir. 2002).

There is no dispute that Nimmer and Jerome are lay witnesses, but they are also being used to offer expert testimony. Plaintiffs argue that their testimony is derived entirely from "their own perception and knowledge of facts gained through participating in the quality audits or the day-to-day affairs of their business."

The court agrees that to the extent these affidavits are based on Nimmer and Jerome's personal, particularized knowledge, they are admissible. However, to the extent that defendant seeks to strike Nimmer and Jerome's statements in the field of hydrogen embrittlement, the motion will be granted.

Next, defendant attacks the affidavit of David Drinnon, the only employee from QMS to offer testimony, because the affidavit attempts to establish that the fasteners that failed were the defendant's by using statements that lack foundation. Drinnon states that he did not see broken bolts matching the fastener identified as supplier C in Exhibit A in drums or anywhere. However, in his deposition he testified as follows:

Q:    As you sit here today, can you tell me that every single bolt
      that broke during the rework program was Supplier C bolt?

A.    No, ma'am, I cannot.

(Aff. Remington, 2, Ex. A; Dep. Drinnon p. 151) Similarly, Wayne Southall stated in his affidavit that had a non-SFE fastener fractured at any time, he would have investigated the

17

situation. However, nothing suggests he examined all of the fasteners. Hence, both statements will be stricken.

Next, Jaime Valtierra, a paralegal employed by plaintiffs' firm, Fisher Kanaris, P.C., was never identified as a witness but has submitted an affidavit to support his compilation of information contained in the daily logs prepared by QMS between March 1, 2003, and March 23, 2003. Valtierra states that as part of discovery, he reviewed a box of documents containing daily repair logs prepared by QMS between March 1, 2003, through March 23, 2003. However, Valtierra goes on to discuss the process by which QMS documented the reworking. For example, he states that QMS was able to determine the date of manufacture of each of the lawn tractors it reworked based on the serial number and the number of fasteners that failed on each particular tractor. Significantly, Valtierra does not purport to have any personal knowledge of the underlying information.

Finally, the three lab reports from Metallurgical Engineering Associates, Inc., John Deere and Materials Engineering and Testing Corporation attached as exhibits J, K and N to plaintiffs' summary judgment motion as well as exhibits W, X, and Y in opposition to defendant's motion, contain inadmissible hearsay, lack foundation and purport to establish expert testimony. None of the authors was named as experts. These reports will not be considered on summary judgment notwithstanding the assertion that plaintiffs' expert, Dr. Eager, relied on them in preparing his opinion. Dr. Eager's use of those reports does not allow these exhibits to be considered for the truth of matter asserted. Hence, defendant's motion to strike will be granted as discussed above.

Case 2:03-cv-01434-CNC   Filed 04/23/08   Page 18 of 38   Document 219

## PLAINTIFFS' MOTION TO EXCLUDE AND/OR LIMIT EXPERT TESTIMONY OFFERED BY THE DEFENDANT AT THE TIME OF TRIAL (DOC. #152)

Plaintiffs argue that defendant's witness, Dr. Deegan, fails to qualify as an expert under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The principal criticism is that Dr. Deegan admitted that testing was not performed under conditions "substantially similar" to those present at the time of baking and plating the fasteners at issue. However, plaintiffs also observe that Dr. Deegan does not have an opinion as to why the fasteners failed. Accordingly, plaintiffs ask that the defendant be precluded from "offering at the time of trial any thoughts, opinions or conclusions as to the cause of the failure of the subject fasteners."

Defendant's response is that Dr. Deegan's opinion is based on sound metallurgical engineering principles and meets the required standards under Federal Rules of Evidence 702 and 703. In addition, defendant asserts that it is the plaintiffs - not the defendant - who bears the burden of establishing that defendant's fasteners failed as a result of hydrogen embrittlement.

The admission of expert testimony is governed by Fed. R. Evid. 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In addition, expert testimony must be relevant and reliable to be admitted. *Daubert* 509 U.S. at 589. The key to evaluating testimony that is based on the witness' personal experience

is determining whether the witness employs "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 152, 119 S. Ct. 1167 (1999).

Plaintiffs' challenges go to the weight, not admissibility, of Dr. Deegan's testimony. Dr. Deegan, a metallurgical and corrosion engineer with over thirty years of experience, is offered in rebuttal to Dr. Eager who opines that fasteners failed as a result of hydrogen embrittlement caused by improper baking procedures. Specifically, Dr. Eager opines that the size of the container used for baking the parts is too large to assure adequate heating of the screws in the middle of the keg because there is no forced air passing through the keg and it is approximately three to four feet in dimension.

Dr. Deegan examined the existing fasteners provided by plaintiffs, hired an independent lab, interviewed witnesses, and designed a testing protocol to challenge Dr. Eager's theory. Having reviewed the submissions of the parties, it appears that Dr. Deegan's opinion rests on sufficient facts and data, that his testimony is the product of reliable principles and methods, and that he has applied those principles and methods reliably to the facts of the case. Whether and to what extent the distribution of the fasteners alters the baking process and the amount of time necessary between plating and baking are appropriate grounds for cross-examination. Consequently, plaintiffs' motion to exclude or limit expert testimony will be denied.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. #143)
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. # 150)

The parties have filed cross motions for summary judgment. Plaintiffs move for summary judgment on liability contending that defendant breached its contract by making

fasteners that were not free of hydrogen embrittlement. Defendant moves for summary judgment on a myriad of grounds: (1) because neither plaintiff can meet the burden of proof in establishing that defendant manufactured the allegedly defective fasteners; (2) because plaintiffs discarded all of the allegedly defective fasteners and most of the documents which were executed to establish that the allegedly defective fasteners were replaced; (3) because neither plaintiff can prove that the number of fasteners replaced establishes a breach of contract; (4) because neither plaintiff can prove that they relied on defendant's skill or judgment to manufacture the fasteners; and (5) because defendant is entitled to payment of $181,288.76 plus interest on fasteners sold to plaintiff Bossard for which Bossard has no defense for its refusal to pay.

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party. *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 470 (7th Cir. 2007) On cross motions, the court construes "all facts and inferences therefrom 'in favor of the party against whom the motion under consideration is made.'" *In re United Air Lines Inc.,* 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## FINDINGS OF FACT

For purposes of resolving the pending summary judgment motions, the court has determined that the following facts are not in dispute. As discussed above, portions of affidavits are inadmissible and therefore have not been considered. In addition, plaintiffs did not respond to defendant's proposed findings of fact, which are therefore deemed admitted.

21

Civil L.R. 56.2(e) (E.D. Wis.). Also, the court used the defendants' citations to the record (Stip. Facts ¶ ___), which correlate with defendant's proposed findings of fact as submitted in Doc. # 147.

Bossard IIP, Inc. is a worldwide distributor of industrial fasteners headquartered in Switzerland. (Plaintiffs' First Amended Complaint) Bossard IIP, Inc., is in the business of purchasing fasteners from various fastener manufacturers and distributing them to end users. (*Id.*) In July of 2002, Bossard IIP, Inc., purchased Larson & Co., a distributor of fasteners headquartered in Milwaukee, Wisconsin, and changed the name to Bossard Milwaukee. (Stip. Facts ¶ 1)

Zurich-Versicherungsgesellschaft, an insurance company headquartered in Switzerland, does business all over the world. (Plaintiffs' First Amended Complaint) For the relevant time period, Zurich provided insurance coverage to Bossard IIP, Inc., and, under a separate policy, to Bossard's United States business units, including Bossard Milwaukee. (Stip. Facts ¶ 2)

Special Fasteners Engineering Company Ltd. (SFE) manufactures fasteners in Kaohsiung, Taiwan. (Stip. Facts ¶ 3) SFE uses a process called cold heading whereby steel wire on coils is fed into a heading machine and cut to the appropriate length before being hammered into the desired shape of a fastener by a die. (Stip. Facts ¶ 4)

In January of 2001, at Bossard's suggestion, John Larson of Larson/Bossard contacted Leon Huang, President of SFE, regarding the manufacture of a specially designed fastener, Bossard part no. GX20234. (Stip. Facts ¶ 5) Bossard told SFE that annual usage would be approximately six million pieces. (Stip. Facts ¶ 6) On February 16, 2001, SFE, through Huang, executed a contract with Bossard for the manufacture of the GX20234 part.

22

(Plaintiffs' Ex. B) The language pertaining to part no. GX20234 states "PARTS MUST BE BAKED AFTER PLATING SO THEY ARE FREE OF HYDROGEN EMBRITTLEMENT." (*Id.*) SFE has admitted to owing a contractual duty to manufacture the fasteners according to print. (Plaintiffs' Ex. HH, ¶ 71)

The following June, SFE began shipping fasteners to Larson/Bossard at its facility in Greenville, Tennessee. (Stip. Facts ¶ 7) The contract between SFE and Larson/Bossard consisted of the preprinted forms exchanged by the parties, including purchase orders and invoices, as well as the print for the fastener. (Stip. Facts ¶ 8) SFE had no discussions with Bossard concerning the types of material that the fastener would be going through in its various applications and had no input into whether the GX20234 fastener was suitable for the proposed application. (Stip. Facts ¶ 9) Unbeknownst to SFE, John Deere, Bossard's customer for the fasteners, designed the GX 20234 fastener for use in 43-50 locations on several models of its L100 series of lawn tractors. (Stip. Facts ¶ 10) SFE never spoke to anyone at John Deere or Bossard regarding the design of the fastener or facts concerning the application of the fastener, such as the material the fasteners would be driving through in the tractor. (Stip. Facts ¶ 11) Larson testified that he believes that he told SFE it was going to be a "universal screw" but does not believe that he had any discussions about the types of material that the fastener would be going through in various applications. (Plaintiffs' Ex. E, at p. 128)

From June of 2001 through June 20, 2002, SFE was the sole supplier of the GX20234 fastener. (Stip. Facts ¶ 12) During that time, SFE manufactured and shipped over five million GX 20234 fasteners to Bossard at its Greeneville facility. (Stip. Facts ¶ 13) All of the fasteners were installed in John Deere tractors without incident. (Stip. Facts ¶ 14) In July

23

of 2002, production for the L100 series line tripled when John Deere began selling the tractors under its brand name.  (Stip. Facts ¶ 15) Without any warning to SFE, on August 20, 2002, Bossard more than doubled its required annual usage of the GX20234 fastener.  (Stip. Facts ¶ 16) On August 23, SFE informed Bossard that it would not be able to meet the required ship dates for the increased quantities due to the unavailability of wire from its wire suppliers. (Stip. Facts ¶ 17) Bossard immediately contracted with two domestic suppliers, Rockford Fasteners and AFI, both located in Illinois, to manufacture the GX20234 fasteners for use at John Deere.  (Stip. Facts ¶ 18) Rockford supplied Bossard with the GX20234 fasteners from August 28, 2002, through December 10, 2002.  AFI supplied fasteners to Bossard from September 13, 2002, through December 26, 2002. (Stip. Facts, ¶ 19) SFE began resupplying GX20234 fasteners to Bossard on October 3, 2002, and continued through March 19, 2003. (Stip. Facts ¶ 20)

Between December 16, 2002, and January 30, 2003, all three manufacturers' fasteners were installed in 43-50 locations on L100 series tractors at John Deere.  (Stip. Facts ¶21) Four GX20234 fasteners were installed in the spindle housing on the deck in each tractor.  (Stip. Facts ¶ 22) The spindle holds the blade and pulley assembly on the mower deck of the tractor.  (Stip. Facts ¶ 23) Two sizes of tracts were manufactured: a 42-inch base and a 48-inch base.  Tractors with a 42-inch base had two spindle housings; tractors with a 48-inch base had three spindle housings.  (Stip. Facts ¶ 24) No records exist to show how many of each manufacturer's fasteners were installed on each tractor.  However, it is agreed that prior to December 16, 2003, each fastener incorporated into the L100 Series tractors was suitable for its intended purpose in that the fasteners conformed to the contract specifications and did not fracture.  (Plaintiffs' Ex. F, ¶¶ 127, 28)

On January 30, 2003, two John Deere employees discovered fastener heads on the ground at John Deere's Southern Distribution Center (SDC) in Greeneville, where tractors are stored after assembly awaiting shipping. The employees brought a "handful" of the fastener heads back to Wayne Southall, John Deere's Quality Manager. (Stip. Facts ¶ 25) Southall then forwarded three of the fastener heads to Eric Nimmer, Bossard's Quality Control Manager, and the rest of the "handful" and a few shanks to a John Deere testing facility in Moline, Illinois, as well as a testing facility in Oak Ridge, Tennessee, called MET. (Stip. Facts ¶ 26) John Deere reached the conclusion that the "5 failed tap screw heads" that were examined failed from hydrogen embrittlement. (Plaintiffs' Ex. K) In addition, MET determined that the intergranular nature of the failure in the two "Failed Tap Screw" it tested indicated that these parts failed as a result of hydrogen embrittlement. (Plaintiffs' Ex. J) Of the handful of fasteners gathered, only the three heads sent to Eric Nimmer still exist. (Stip. Facts ¶ 27)

Initially, all of the broken fastener heads that John Deere examined had the same head marking. (Stip. Facts ¶ 28) As a result, John Deere assumed the lots from the manufacturer were defective and shut down the production lines using that head style fastener. (Stip. Facts ¶ 29) John Deere then contacted Bossard to find out the manufacturer and lot numbers to allow them to isolate the affected tractors. (Stip. Facts ¶ 30) Bossard responded that SFE was the manufacturer and tracked the last two shipments from SFE; Bossard lot number of 109998, consisting of 1,078,000 fasteners received on December 16, 2002, and Bossard lot number 110007, consisting of 540,000 fasteners received on December 26, 2002. (Stip. Facts ¶ 31) Based on that information, John Deere concluded that all tractors assembled from December 16, 2002, through January 30, 2003 (the dates of

25

delivery and installation of those lots to John Deere) could contain defective fasteners. (Stip. Facts ¶ 32) Roughly 50,000 tractors stored at the SDC were assembled during those dates. (Stip. Facts ¶ 33)

On February 1, 2003, Mike McClain, an engineering supervisor with John Deere, drafted a document (John Deere Rework) that identified the three head styles of the subject fasteners and provided instructions on how to test the suspect fasteners and replace broken ones. (Stip. Facts ¶ 34) Not all 43-50 locations were to be checked; rather, McClain identified specific locations that were "critical." (Stip. Facts ¶ 35) Physical examination of the head marking of each individual fastener is the only way to determine the manufacturer. (Stip. Facts ¶ 36) The John Deere Rework required an employee to examine each fastener individually, confirm it was manufactured by Supplier C, as identified in McClain's rework, and, if so, administer the torque test set out in the report. (Stip. Facts ¶ 37) If the fastener broke following the test, the Rework required replacement. (Stip. Facts ¶ 37) If not, the fastener was to be left alone. (Stip. Facts ¶ 37) At the time of the report, John Deere did not know the manufacturer's names, but in the photograph submitted by the parties Supplier A is AFI, Supplier B is Rockford, and Supplier C is SFE. McClain acknowledged the difficulty in visually distinguishing the Rockford and SFE fasteners in his report: "Fastener B and C may be difficult to distinguish. If in doubt, test." (Stip. Facts ¶ 38)

On February 6, 2003, Jean Louis Jerome, Vice President of Engineering Quality for Bossard IIP, met Eric Nimmer of Bossard in Greeneville to survey the situation. The two men walked through the SDC in search of additional broken fasteners and found approximately twenty-four. (Stip. Facts ¶ 39) At that time, Nimmer spoke with individuals from

John Deere regarding the details of John Deere's proposed program to rework the tractors which contained the alleged defective fasteners. (Stip. Facts ¶ 40)

John Deere addressed the broken fasteners in two separate phases. Tractors that had not been shipped from the SDC were fixed through a rework process, and tractors that had already been shipped were addressed through warranty claims.

John Deere hired Quality Manufacturing Services (QMS) to implement the rework process on or about February 4, 2003. (Stip. Facts ¶ 41) John Deere rented a separate warehouse for the project in Jefferson City, Tennessee, called the Five Rivers Warehouse, and shipped the tractors there for rework. (Stip. Facts ¶ 42) The project took 63 days to complete. (Stip. Facts ¶ 43)

David Drinnon, owner of QMS, and Valerie Perez, a QMS supervisor, oversaw the rework process, which consisted of hiring, training, and supervising the employees that carried out the rework. (Stip. Facts ¶ 44)

QMS drafted a procedure for the QMS employees to follow known as the "Hardware Rework and Quality Inspection Process" separate from John Deere Rework drafted by McClain. (Stip. Facts ¶ 45) QMS provided this document to John Deere. (Stip. Facts ¶ 46) QMS' procedure and its implementation for the rework differed from the John Deere Rework in one glaring regard: QMS did not require employees to check and remove only Supplier C (SFE) fasteners. (Stip. Facts ¶ 47) Instead, the QMS rework required the employees to check and replace all fasteners at the predesignated points on the John Deere tractors (typically 27 points) regardless of who manufactured them and to remove all fasteners at the spindle housing of the tractor (regardless of whether these fasteners failed) if one fastener at the spindle broke during the torque test. (Stip. Facts ¶ 48) Thus if all four

fasteners in the spindle were intact upon inspection, but one fastener broke during the torque test, three intact fasteners were removed.

Documents from QMS on the results of the rework process are incomplete and contain no information regarding the manufacturer of the fasteners. QMS maintained Bolt Repair Logs during the Rework which include (1) how many broken fasteners were on a tractor, (2) how many fasteners were replaced on a tractor, and (3) the location of the broken fasteners. (Stip. Facts ¶ 49) Valerie Perez, A QMS supervisor, testified that QMS did not record whether the number of broken fasteners included fasteners that were broken upon inspection, ones that broke during testing, or both. (Stip. Facts ¶ 50) Further, as employees were not required to check manufacturer, they did not record any information regarding the manufacturer on the Logs. (Stip. Facts ¶ 51) Without any information on manufacturers, other than a physical examination of the removed fasteners, there is no way to determine which of the manufacturer's fasteners was installed on each tractor, where each manufacturer's fasteners was located if more than one manufacturer's fasteners was used, who manufactured the broken fasteners, or who manufactured the intact fasteners that failed the torque test or who manufactured the intact fasteners removed if one of the four spindle fasteners failed the torque test. Plaintiffs produced no other witnesses who participated in the rework process.

Using the data from the QMS Bolt Repair Logs, Al McGee of John Deere drafted a failure rate analysis to determine how many fasteners allegedly failed. (Stip. Facts ¶ 52) McGee's analysis assumed that all the broken and removed fasteners were manufactured by SFE. (Stip. Facts ¶ 53) Using the total number of fasteners from the two subject lots, McGee estimated that 100,000 fasteners failed, which correlated to a 6% failure rate from the SFE

fasteners. In January 2006, McGee discarded his file containing data to support his analysis, two years after this lawsuit was filed and four months after John Deere was provided with a subpoena related to this matter. (Stip. Facts ¶ 54)

John Deere discarded at least half of the Bolt Repair Logs from QMS. According to Wayne Southall, John Deere sent two boxes of Bolt Repair Logs from the rework into storage until it received final payment from Zurich. Only one box containing Log Sheets for March remains. (Stip. Facts ¶ 55) As a result, none of the documentation from QMS for February and April has been produced.

John Deere and Bossard were aware of how QMS conducted the rework. Individuals from Bossard observed QMS carrying out the rework during the first week of the program, and Eric Nimmer visited the Five Rivers Warehouse on February 13, 2003, with Don Casper of John Deere. (Stip. Facts ¶ 56) Moreover, Nimmer discussed the rework process with Drinnon and Perez during his visit. (Stip. Facts ¶ 57) However, Nimmer never requested that QMS preserve the removed or broken fasteners, or that QMS include manufacturer information on its repair logs. (Stip. Facts ¶ 58)

All of the broken and removed intact fasteners collected by John Deere and QMS were put into two collection barrels at the Five Rivers Warehouse. (Stip. Facts ¶ 59) John Deere gathered the broken fasteners it collected from the SDC in boxes and placed them into barrels. (Stip. Facts ¶ 60) The barrels were then taken to the Five Rivers Warehouse for use by QMS. (Stip. Facts ¶ 61) QMS collected the fasteners in boxes on the lines and dumped them into the barrels at the end of the day. (Stip. Facts ¶ 62) QMS left the barrels of fasteners at the Five Rivers Warehouse after completing the rework. (Stip. Facts ¶ 64) John Deere kept the barrels of fasteners until sometime after it received the final

payment from Zurich on January 8, 2004, and then threw them away. (Stip. Facts ¶ 65) Neither Zurich nor Bossard requested that John Deere keep the fasteners or that the fasteners be delivered to Bossard's facility in Greeneville. (Stip. Facts ¶ 65)

In response to discovery requests, plaintiffs have produced 14 heads of SFE fasteners, 98 shanks of fasteners which are not identifiable by manufacturer, 175 intact SFE fasteners that were removed from John Deere tractors, and 9 intact AFI fasteners. (Stip. Facts ¶ 67) According to witness testimony, all of the other fasteners, broken or intact, found or removed during the investigation and rework were discarded after January of 2004. (Stip. Facts ¶¶ 74, 84)

John Deere opted to repair tractors that had been shipped prior to January 30, 2003, through a Product Improvement Program (PIP). Under the PIP, John Deere instructed dealers on how to test and replace broken fasteners on tractors and submit them as warranty claims. (Stip. Facts ¶ 68) Once a dealer completed the work, he sent information to John Deere electronically showing the number of fasteners used and the amount of labor. (Stip. Facts ¶ 68) John Deere then compiled the electronic information received from all dealers and produced a spreadsheet of warranty claims which it later submitted to Zurich for payment on its claim. (Stip. Facts, ¶ 69) None of the underlying documentation from dealers that serves as the basis for the summary spreadsheet was collected from dealers or produced in this litigation. (Stip. Facts ¶ 71)

The testimony is unclear as to how the dealers carried out the reworking of tractors under the PIP. Diane Kalmes was responsible for implementing the PIP on behalf of John Deere, and is plaintiffs' only witness on the PIP. (Stip. Facts ¶ 72) Kalmes testified

that she does not know if the fasteners removed as part of the PIP were fasteners manufactured by SFE.  (Stip. Facts ¶ 73)

No evidence exists to identify the manufacturer of the fasteners removed or replaced as part of the PIP.  According to Kalmes, all of the fasteners collected as part of the PIP were thrown away.  (Stip. Facts ¶ 74) Kalmes further testified that the bulletin sent to dealers outlining the PIP instructed dealers to discard the removed fasteners and that no fasteners were returned as part of the PIP.  (Stip. Facts ¶ 75) Further, John Deere did not require dealers to identify or record the manufacturer or a broken or removed fastener in submitting a warranty claim or to return the fasteners to John Deere.  (Stip. Facts ¶ 76)

Following its discovery of the alleged failed fasteners in February of 2003, Bossard refused to pay SFE for invoiced fasteners in the affected lots and shipments received through March of 2003 (lots that had been manufactured and/or shipped prior to the discovery at John Deere).  Bossard withheld payment of $34,931.05 on invoice numbers 21108, 21122, 21212, 21226, 30109, and 30128 from SFE and deducted an additional $62,146.32 on those invoices.   On invoices 30109 and 30128 Bossard withheld payment of $52,573.24 and deducted $31,638.15 from amounts paid to SFE for costs of transport and duty.  (Stip. Facts ¶ 78) In total, Bossard failed to pay SFE $181,288.76 invoiced under the contract.

John Deere sought reimbursement for $3.4 million in out of pocket costs from Bossard following the rework process and the PIP.  (Stip. Facts ¶ 79) Bossard then presented the claim to Zurich for coverage under its policy.  (Stip. Facts ¶ 80) Zurich paid John Deere the full amount in a series of payments, the last of which occurred on January 8, 2004.  (Stip. Facts ¶ 81)

Bossard and Zurich filed a complaint against SFE and its parent corporation Trifast, PLC, on December 11, 2003, seeking the $3.4 million paid to John Deere as well as an additional $477,000 in uninsured loss by Bossard. (Stip. Facts ¶ 82) The complaint charges that SFE breached the contract and the implied warranties of merchantability and fitness for a particular purpose by providing defective fasteners to Bossard. (Stip. Facts ¶ 83)

Trifast moved to dismiss the claims against it for lack of personal jurisdiction. Following discovery and briefing, the court dismissed Trifast on June 7, 2005. SFE answered the complaint and counterclaimed for $181,288.76 in unpaid invoices for the GX20234 fasteners. Plaintiffs' answer admitted the invoices remain unpaid. (Stip. Facts ¶¶ 77, 78)

## CONCLUSIONS OF LAW

Plaintiffs maintain that they are entitled to summary judgment on their breach of contract claim. Under Wisconsin law, contracts are to be construed as they are written. *Amcast Indus. Corp. v. Affiliated FM Ins. Co.*, 221 Wis.2d 145, 584 N.W.2d 218, 226 (Ct. App.1998). When the language is plain and unambiguous, a reviewing court must construe the contract as it stands. *Keller v. Keller*, 214 Wis.2d 32, 571 N.W.2d 182, 184 (Ct. App. 1997). In construing the contract, terms are to be given their plain and ordinary meaning. *Meyer v. City of Amery*, 185 Wis.2d 537, 518 N.W.2d 296, 298 (Ct. App.1994). That a contract term is general enough to encompass more than one interpretation does not necessarily make that term ambiguous. *Amcast,* 584 N.W.2d at 226 (citing *Mattheis by Vowinkel v. Heritage Mut. Ins. Co.*, 169 Wis.2d 716, 487 N.W.2d 52, 54 (Ct. App.1992)). Finally, giving a reasonable meaning to every provision of the contract is preferable to leaving some of the language useless or superfluous. *Heritage Mutual Ins. Co. v. Truck Ins. Exchange*, 184 Wis.2d 247, 516 N.W.2d 8, 9 (App.1994).

The print, which is part of the contract, states in the lower left corner that "PARTS MUST BE BAKED AFTER PLATING SO THEY ARE FREE OF HYRDROGEN EMBRITTLEMENT." Plaintiffs maintain that there are no disputed facts on this issue. Because the fasteners allegedly failed due to hydrogen embrittlement, defendant failed to supply fasteners "free of hydrogen embrittlement." Plaintiffs also assert that Zurich's payment of $3,003,473 to John Deere is prima facie evidence of damages.

In response to plaintiffs' first request for admission, no. 71, defendant "admits it had a contractual duty to provide GX20234 fasteners in accordance with the print, identified as deposition exhibit 54, bates no. SFE0686." (Plaintiffs' Ex. I, p. 15) However, that admission alone does not entitle the plaintiffs to summary judgment on the issue of liability. What was required by the print and whether defendant supplied fasteners in accordance with it is an issue of fact that will need to be resolved at trial.

For example, Dr. Eager and Dr. Deegan, the parties' experts, have offered competing theories on whether defendant's baking process caused any hydrogen embrittlement. In his affidavit, Dr. Deegan has stated that the fracture surfaces he viewed "exhibited intergranular failures that may be consistent with hydrogen embrittlement, but that could also be consistent with stress corrosion cracking." Also, defendant has submitted evidence that different industry standards allow for different amounts of time between the electroplating process and placement in the oven for baking. Finally, there is a genuine issue of material fact as to the type of keg used to bake the fasteners. The owners of TYC claimed they used a keg within the keg design when baking the fasteners. Plaintiffs' expert disputes this claim based on Jerome's testimony.

33

In light of these genuine issues of material fact, liability cannot be determined and there is no need to address the second issued: damages. It is sufficient to note that genuine issues of material fact exist insofar as evidence has been destroyed and plaintiffs have not met their burden of showing, as a matter of law, that all fasteners replaced during the rework and product improvement program were manufactured by the defendant. As a consequence, plaintiffs' summary judgment motion has failed.

Similarly, issues of fact preclude summary judgment on defendant's motion. Defendant first argues that plaintiffs cannot prove they manufactured the fasteners that failed. Defendant argues that John Deere used at least 600,000 fasteners from other manufacturers between December 16, 2002, and January 30, 2003. Defendant further argues that there is no evidence of how many fasteners from each manufacturer were installed on each tractor, where each manufacturer's fasteners were located on each tractor, how many failed on each tractor, where the failures occurred, whether the failures occurred before or during the torque test performed by QMS, or whether the dealers even performed the torque test during the PIP.

Plaintiffs cite to the testimony of the John Deere employees, William Zelnio, Al McGee, Mike McClain, Wayne Southall and Donald Casper, who have all testified that they observed broken fasteners that were in some way linked to the defendant. For example, McGee saw approximately 11 broken heads of SFE fasteners, and McClain testified that all of the failed fasteners were of a particular head style. He later learned that it was the defendant's fastener. Casper stated the fasteners he observed were manufactured by defendant. Drinnon, the owner of QMS, testified that the broken heads he saw belonged to defendant. Further, the sampling of fasteners that still exists include failed fasteners

manufactured by defendant. Defendant's motion for summary judgment on this issue will be denied.

Next, defendant argues that where evidence critical to a party's case has been destroyed by not fault of that party, prejudice has occurred sufficiently to warrant dismissal of the case. Defendant maintains that plaintiffs' failure to preserve the replaced fasteners has caused undue prejudice to defendant thereby warranting dismissal of the case. In support of their argument, defendant cites *Marrocco v. General Motors Corp.* 966 F.2d 220 (7th Cir. 2002).

In *Marrocco*, the court issued a protective order requiring the parties to preserve the condition of a car involved in an accident. *Marrocco,* 966 F.2d at 221. Sometime thereafter, plaintiffs' expert engaged in ex parte, invasive testing, which led to destruction of the evidence. *Id.* The district court sanctioned the plaintiffs by granting the defendant's motion to dismiss, and the Seventh Circuit Court of Appeals affirmed. *Id.* 966 f.2d at 222, 225.

In the companion case, *Goodyear*, the defendant violated a protective order that required them to "preserve, keep safe and maintain" a rim base and side ring. *Id.* In that case, however, the defendant argued that the loss of the side ring was accidental. *Id.* The employee responsible for packaging the side ring was unfamiliar with the special requirements for shipping odd size items and had assumed it was adequate because the driver accepted the side ring without comment. *Id.* The Seventh Circuit Court of Appeals commented that sanctions are appropriate in one of three instances - where the noncomplying party acted either with wilfulness, bad faith or fault. *Id.*, 966 F.2d at 224. Fault describes the reasonableness of the conduct - or lack thereof -which eventually culminated in the violation.

35

*Id.* The Seventh Circuit affirmed the dismissal of the complaint because even if the failure to safeguard the evidence was the fault of a shipping employee, the loss was still imputed to those who set company policy. 966 F.2d at 224-25.

In the case at bar, the parties never sought and the court never entered an order to preserve evidence. Neither plaintiffs nor plaintiffs' expert destroyed the fasteners at issue. Moreover, the court finds no basis to impute the loss to the plaintiffs for the purpose of dismissing the complaint. For these reasons and the reasons set forth in the discussion of the motion for sanctions, the defendant's summary judgment motion has been denied also.

Along the same lines, defendant argues that failure to preserve the fasteners precludes plaintiffs from proving SFE breached the contract or the implied warranties as a matter of law. According to defendant, the few fasteners that exist are insufficient to establish a breach as a matter of law based on the plaintiffs' expert's testimony that a 1% failure rate is acceptable for the GX20234 fastener. However, the existence of the fasteners and the factual dispute regarding the failure rate preclude summary judgment on this issue.

With respect to plaintiffs' claim that defendant breached a warranty of fitness for a particular purpose, defendant argues that plaintiffs relied on SFE in selecting the GX20234 fastener. Defendant contends that its role was to manufacture the part according to the drawing it received from Bossard, and nothing more. According to defendant, it did not design the fasteners, and no one from Bossard or John Deere contacted defendant for advice or consultation regarding the application for the fasteners and whether the fastener design was acceptable.

Wisconsin Stat. § 402.315 sets forth the requirements for implied warranty of fitness:

Case 2:03-cv-01434-CNC   Filed 04/23/08   Page 36 of 38   Document 219

Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under s. 402.316 an implied warranty that the goods shall be fit for such purpose.

In light of the testimony of John Larson who believes he mentioned that the GX20234 fasteners would be used as a universal application in the tractors, there is a genuine issue of material fact regarding whether defendant knew the purposes for which the fasteners were required.

Finally, defendant submits that it is entitled to judgment on its counterclaim for nonpayment by Bossard. Bossard refused to pay defendant for invoiced fasteners in the affected lots and shipments received through March 2003. Bossard admits that it withheld payment of $34,931.05 on invoice numbers 21108, 21122, 21212, 21226, 30109, and 30128 and deducted an additional $62,146.32 on the same invoices. On invoices 30109 and 30128, Bossard withheld payment of $52,573.24 and deducted $31,638.15 from amounts paid to SFE for costs of transport and duty. In total, defendant claims it is owed $181.288.76 in unpaid invoices.

Plaintiffs neglected to present any admissible evidence that it properly rejected the invoiced fasteners or revoked its acceptance as required under Wisconsin law. Wis. Stats. §§ 402.606, 402.607, and 402.602. Plaintiffs rely exclusively on the affidavit of Eric Nimmer, but the relevant portions of that affidavit are inadmissible insofar as it failed to establish that Nimmer had personal knowledge or attempted to assert facts without proper foundation. Hence, there is no evidence that someone from Bossard told defendant SFE that

the fasteners were rejected or documentation establishing that SFE had notice. For these

reasons, the court has granted the defendant's motion for summary judgment regarding its

unpaid invoices in the amount$181,288.76.

Dated at Milwaukee, Wisconsin, this 23rd day of April, 2008.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE